**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SURE–TAN, INC. and Surak Leather Company, Respondent.**

No. 77–2020.

United States Court of Appeals, Seventh Circuit.

Heard April 5, 1978.

Decided Aug. 25, 1978.

Harlington Wood, Jr., Circuit Judge, filed dissenting opinion.

**356**

Lawrence Blatnik, Atty., N. L. R. B., Washington, D. C., for petitioner.

John A. McDonald, Chicago, Ill., for respondent.

Before CUMMINGS and WOOD, Circuit Judges, and VAN PELT, Senior District Judge.*

\* The Honorable Robert Van Pelt, Senior District Judge of the District of Nebraska, is sitting by designation.

CUMMINGS, Circuit Judge.

In this case the National Labor Relations Board has asked us to enforce its order requiring respondent Company to bargain with the Union.[1] The Company opposes enforcement on the ground that the Board's certification of the Union was invalid.

Before January 1973, brothers J. V. and S. S. Surak and a third person were partners in the business of purchasing, tanning and selling hides under the name National Rawhide Manufacturing Company, with its facility at 1470 West Webster Avenue in Chicago. In its last full year of operation, the partnership's gross volume of business was about $210,000, of which over $50,000 represented out-of-state sales. When the partnership terminated on January 5, 1973, the Surak brothers formed Sure-Tan, Inc., an Illinois corporation engaged in the business of tanning hides at the same facility. They also formed Surak Leather Company, a partnership engaged in the business of purchasing and selling hides at the same address and with no employees. The brothers worked six days a week, twelve hours a day, performing work for both businesses during that time. Different desks and filing cabinets are designated for each company, but otherwise the brothers use their office space at the facility to perform work for both companies. Sure-Tan performs 100% of its work for Surak Leather Co. and 92% of the hides purchased by Surak Leather are tanned by Sure-Tan. Sure-Tan, Inc. employs 11 persons, including its two corporate officers. Because the partnership and the corporation were integrated, the Labor Board has treated them as a single employer (the Company).

On August 12, 1976, the Union filed a petition seeking certification as the bargaining representative of an appropriate unit of the Company's employees. After pre-election hearings in September and Oc-

1. Chicago Leather Workers Union, Local 43L, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO.

tober 1976, the Board's Regional Director for Region 13 issued his decision and direction of election. He found that the corporation and the partnership constituted a single integrated enterprise that was an employer engaged in commerce within the meaning of the National Labor Relations Act because the Company's "combined direct and indirect outflow of goods across state lines exceeds $50,000," which is the Board's discretionary standard for jurisdiction over non-retail enterprises (Board App. 4). In accordance with a stipulation between the parties, the appropriate unit was described as: "all production and maintenance employees employed at the Employer's facility now located at 1464–1470 West Webster Avenue, Chicago, Illinois, but excluding office clerical employees, guards, professional employees and supervisors as defined in the Act" (Board App. 1). He ordered an election to be held on December 10, 1976 (see Board App. 14). The Company filed a request for review of his decision, challenging its jurisdiction, but the Board denied the request as insubstantial on December 3, 1976.

The election was conducted on December 10, 1976, showing six ballots for the Union and one against it.[2] The Company filed objections to the election on the ground that six of the seven eligible voters were illegal aliens and that a Union representative had told them he could secure clearance from the Immigration and Naturalization Service of the Department of Justice so that they and their families could reside and work in the United States. The Regional Director overruled the Company's objections because one of the employee witnesses in support of the objections denied he had ever met with a representative of the Union, and the other two denied that the Union representative made the above statement. The Regional Director found that the employees were entitled to the protection of the Act despite their lack of valid working papers and consequently certified the Union on January 17, 1977. A month later, the Board denied the Compa-

ny's request for review of his ruling and on the next day the Union requested the Company to bargain collectively but it refused to do so.

Because of the Company's refusal to bargain collectively, the Union filed a charge on March 1, 1977, prompting the Board's General Counsel to issue a complaint and an amended complaint alleging that the Company was violating Section 8(a)(5) and (1) of the Act (29 U.S.C. § 158(a)(5) and (1)). After the Company filed an answer and an amended answer which noted that the aliens had been deported after the election, the General Counsel requested the Board to grant summary judgment, which the Board did on August 4, 1977.

In its accompanying decision and order, the Board found that Surak Leather Company and Sure-Tan, Inc. were co-partners constituting a single integrated enterprise and that the Company sold goods in interstate commerce and also sold goods to an Illinois customer meeting the Board's jurisdictional standards, so that the total value of direct and indirect outflow of goods across state lines exceeded $50,000. Therefore, the Board found that the Company was engaged in commerce within the meaning of Section 2(6) and (7) of the Act (29 U.S.C. § 152(6) and (7)).

The Board found that the appropriate unit for collective bargaining purposes within the meaning of Section 9(b) of the Act (29 U.S.C. § 159(b) consisted of all the Company's "production and maintenance employees" and that a majority of them had designated the Union as their collective bargaining representative on December 10, 1976, resulting in its certification on January 17, 1977. The Board also found that commencing on February 18, 1977, the Union requested the Company to bargain collectively but that the Company refused to do so in violation of Section 8(a)(5) and (1) of the Act. Consequently, the Board ordered the Company to bargain with the

---

**2.** An eighth ballot was challenged on the ground that employee Albert Strong is a super-

visor (Board App. 5). This issue is not involved herein.

Union and to post appropriate notices at its Chicago facility.[3] See 231 NLRB No. 32.

*Jurisdiction of Board*

■ The Company first argues that its business did not meet the Board's jurisdictional requirement of $50,000 worth of annual interstate activity. However, it is well settled that the Board can treat separate corporations as a single entity where the firms are highly integrated with respect to ownership and operation (*Radio Union v. Broadcast Service*, 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789), and that the Board's finding that two firms constitute a single enterprise is essentially a factual determination. See *National Labor Relations Board v. R. L. Sweet Lumber Co.*, 515 F.2d 785, 793 (10th Cir. 1975), certiorari denied, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302, *National Labor Relations Board v. M. P. Building Corp.*, 411 F.2d 567, 568 (5th Cir. 1969). The facts and the accepted criteria whether a single enterprise exists, as found by the Regional Director in his November 10, 1976, decision and direction of election (Board's App. 2–4) and in the Board's decision and order (231 NLRB No. 32 at pp. 6–7), satisfy us that the Board was justified in treating the partnership and the corporation as a single employer. It is not significant that in the manner in which the enterprise was divided the partnership was allocated no particular employees. See generally *Insulated Building Material Co.*, 162 NLRB 1105, 1109 (1967). Therefore, the Board was entitled to consider the combined commerce data for both operations. Here the Company's combined indirect and direct outflow of products across state lines

exceeded the jurisdictional requirement of $50,000 because its direct interstate outflow was $29,000 and its indirect outflow through its customer Nationwide Glove Company amounted to $31,000 to $32,000. *National Labor Relations Board v. Marlboro Food Service, Inc.*, 366 F.2d 477 (10th Cir. 1966), certiorari denied, 386 U.S. 912, 87 S.Ct. 862, 17 L.Ed. 785; *National Labor Relations Board v. Cross Poultry Company*, 346 F.2d 165 (4th Cir. 1965), certiorari denied, 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 establish that in such circumstances the Board had jurisdiction.

*Alienage of Voting Employees Does Not Taint Election*

■ The Company's objection to the certification and bargaining order rests on the facts that six of the seven eligible voters were aliens working and unlawfully residing in the United States, and that the aliens have been deported. Based on those facts, the Company argues that certification is improper because it would be inconsistent with federal immigration laws, particularly 8 U.S.C. § 1182(a)(14).[4] We have considered this issue, which apparently is one of first impression, as well as the argument that a bargaining order is improper due to employee turnover, and agree with the Board that the certification and the bargaining order need not be withdrawn.

In determining whether an illegal alien can vote in a Board election, it is important to begin by referring to the definition of "employee" in the Act. Section 2(3) of the Act (29 U.S.C. § 152(3)) defines the term broadly,[5] and despite some contrary hints

3. Neither reinstatement nor back pay was ordered, so that we need not consider the bogeymen the Company raises with respect thereto.

4. That Section provides that aliens seeking to enter the United States to perform labor cannot lawfully secure visas for the United States without an appropriate certification by the Secretary of Labor.

5. Section 2(3) provides:
"The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this

subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed

about the legislative history in distinguishable Supreme Court opinions,[6] the longstanding and consistent interpretation by the Board has been that aliens are employees under the Act, and therefore are fully eligible voters. See *Cities Service Oil Co.,* 87 NLRB 324, 331 (1949); *Seidmon, Seidmon, Henkin & Seidmon,* 102 NLRB 1492, 1493 (1953); *Lawrence Rigging, Inc.,* 202 NLRB 1094, 1095 (1973); *Handbilling Equipment Corp.,* 209 NLRB 64, 65 n. 5 (1974); *Amay's Bakery & Noodle Co.,* 227 NLRB 214 (1976). Because the Act does not exclude aliens but rather is written broadly, and because "the interpretation of the administrator who is charged with the administration or enforcement of the statute * * * is entitled to great weight and should be followed unless there are compelling indications that it is wrong" (*Old Ben Coal Corp. v. Interior Board of Mine Operations Appeals,* 523 F.2d 25, 36 (7th Cir. 1975)), we hold that aliens are employees and are eligible to vote under the Act.

The Company's argument that the Board's interpretation is wrong because allowing the aliens to vote contradicts federal immigration policy is unpersuasive. While the Board urges us to adopt the position, hotly disputed in cases questioning the certification of racially discriminatory unions (see, *e. g., National Labor Relations Board v. Mansion House Center Management Corp.,* 473 F.2d 471 (8th Cir. 1973); *National Labor Relations Board v. Sumter Plywood Corp.,* 535 F.2d 917 (5th Cir. 1976), certiorari denied, 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538; *Handy Andy, Inc.,*

228 NLRB 447 (1977)), that the Board should not enforce policies administered by other government agencies (see *Carpenters' Union v. National Labor Relations Board,* 357 U.S. 93, 108–111, 78 S.Ct. 1011, 2 L.Ed.2d 1186),[7] a resolution of that dispute is not necessary here because upon close examination this certification and bargaining order are not inconsistent with federal immigration laws. Just as it is true, as the dissent implies, that no federal immigration statute actually prohibits an employer from hiring an illegal alien (see *DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43), it is also true that no immigration statute prohibits an illegal alien from working and voting in a Board election. In fact, despite the fact that their presence is unlawful, illegal aliens have some constitutional rights, and the Supreme Court has implied that Congress can extend them privileges if it so desires. See *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 883, 48 L.Ed.2d 478. Therefore, to the extent that the immigration laws rather than the labor laws are relevant, the analysis cannot stop after noting the aliens' status but must determine how the policies underlying the immigration laws are best advanced under these circumstances. If such a determination involves "speculation" (*infra,* p. 362), then it only points out a reason why the question should be left to immigration officials rather than to the Board and why the courts should not intervene to alter Congress' definition of an employee protected under the Act.

by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined."

6. In *Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 144, 77 S.Ct. 699, 703, 1 L.Ed.2d 709, the Court quoted from the legislative history a statement that "the bill herewith reported has been formulated as a bill of rights both for *American* workingmen and for their employers" (emphasis by Supreme Court). See *McCulloch v. Sociedad Nacional,* 372 U.S. 10, 20, 83 S.Ct. 671, 9 L.Ed.2d 547. Both *Benz* and *McCulloch* are not controlling here because they did not turn on the definition of employee but rather rested on the fact that the alien workers were aboard foreign vessels, so that

asserting jurisdiction would thrust the Board into international relations. See *Longshoremen v. Ariadne Co.,* 397 U.S. 195, 198–199, 90 S.Ct. 872, 25 L.Ed.2d 218. In any event, the reference to American workingmen may have meant only that the workers be American residents. *Longshoremen v. Ariadne Co., supra,* at 199–200, 90 S.Ct. 872.

7. *Carpenters' Union* may not be as controlling here as it might in other contexts because the typical drawbacks of Board enforcement of other policies, such as delayed Board proceedings and invasion of discretional decisions of other agencies, are minimized if all the Board need do is check for valid working papers.

In evaluating whether the Board's action in this case is inconsistent with federal immigration policy, it is important to note first that, unlike the racial discrimination cases analogized by the Board, in which the law-violating union arguably receives some benefit from certification, here the lasting benefit goes not to the law violators—the aliens—but rather to the Union, which is not accused of wrongdoing.[8] In fact, as noted below, the aliens can be deported and thus stripped of whatever benefits they received while the Union's certification remains. Second, in the long run, declining to certify this Union could only have the effect of encouraging violations of the immigration laws. Again unlike the racial discrimination cases, in which the employer did not choose the union involved, the Company here has a choice of whether or not to hire the illegal aliens in the first place. If a company can avoid certification merely by hiring aliens, undoubtedly some companies will choose to hire such aliens in order to gain immunity from labor unions. Cf. *Gates v. Rivers Construction Co.,* 515 P.2d 1020, 1022 (Alaska 1973). Thus by refusing to certify unions with a majority of alien members we would be giving employers an extra incentive to hire aliens and thus would be defeating the goals of the immigration laws.

The likelihood of this result may be illustrated even by the facts of this case, in which, according to the Regional Director's January 17, 1977, supplemental decision (Board App. 10), John Surak, president of Sure-Tan, Inc., stated that several months before the election was held, he was told that the "employees were illegally present in the United States." While the Board chose not so to infer in this case, the obvious possibility is that a company would hire illegal aliens without informing the Immigration and Naturalization Service and without seeking certification of the aliens from the Secretary of Labor, as more responsible employers frequently do (see, e. g., *Stenographic Machines v. Regional Administrator,* 577 F.2d 521 (7th Cir. 1978), knowing that if the aliens successfully unionize they could then be reported to the Immigration and Naturalization Service and deported.[9] It is not necessary to hold here that the employer is estopped from making this argument, but at the least it is clear that in view of this prior knowledge (and prior disregard of its alleged duty under the immigration laws), it ill becomes the Company to argue after losing the election that certification would conflict with the immigration laws. The dissent mischaracterizes this result when it suggests that our opinion places liability on the employer for hiring the aliens despite Congress' unwillingness to penalize that conduct. The result mandated by this opinion is no different from what would have occurred had six of seven non-alien employees voted in an election and then departed for almost any reason short of a revolt from their Union. Only by failing to enforce the Board's order would we be distinguishing the present situation from any other, and the result of that distinction would not be to penalize the employer for hiring the aliens but rather would be to give it a bonus of a period free from unionization that otherwise it would not have enjoyed.

---

8. The racial discrimination cases, on which we offer no opinion, also are distinguishable because in those cases a constitutional violation is alleged and it is claimed that certification, by supporting the union's discrimination, constitutes governmental action in violation of the Fifth Amendment. See generally *National Labor Relations Board v. Sumter Plywood Corp.,* 535 F.2d 917, 930 (5th Cir. 1976), certiorari denied, 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538; *Handy Andy, Inc.,* 228 NLRB 447 (1977). Here no constitutional violation is claimed.

9. Should the Board determine that a company reports aliens as a result of their attempt to unionize, in addition to charging a violation of Section 8(a)(5) it might also attempt to prove a violation of Section 8(a)(3). The fact that the company arguably made a justifiable response to illegality may not immunize that action if it is taken as a direct result of union activity. See *National Labor Relations Board v. Stafford Trucking, Inc.,* 371 F.2d 244, 247 (7th Cir. 1966); *Bloom/Art Textiles, Inc.,* 225 NLRB 766 (1976). Since the Board did not so charge here, it is not necessary to decide whether an alien could receive back pay. See note 3 *supra* and text accompanying note 8.

Determining that aliens are protected by the National Labor Relations Act and that allowing them to vote is not inconsistent with federal immigration laws does not necessarily prove that a bargaining order is appropriate. Since the aliens have been deported, it could be argued that the substantial employee turnover rebuts the Union's majority status. However, the consistent position of the Board is that the new employees are assumed to support the Union in the same percentage as did the old employees (see, e. g., *Dynamic Machine Co.,* 221 NLRB 1140, 1142 (1975), enforced 552 F.2d 1195 (7th Cir. 1977), and that as a result "a high turnover of employees unaccompanied by objective evidence that new employees do not support the union is no evidence of loss of majority status by the union." *National Labor Relations Board v. Washington Manor, Inc.,* 519 F.2d 750 (6th Cir. 1975) (100% turnover counting departures of replacement employees).

This position is particularly applicable when, as here, the turnover takes place during the Union's certification year, so that the Union's majority status is irrebuttably presumed absent "unusual circumstances." *Brooks v. National Labor Relations Board,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125.[10] Thus during the certification year other courts have refused to find turnover by itself determinative even when the new employees are strikebreakers, who arguably have a different perspective about the union than did the old employees. See *National Labor Relations Board v. Alva Allen Industries, Inc.,* 369 F.2d 310, 320 (8th Cir. 1966); *National Labor Relations Board v. Reliance Clay Products Co.,* 245 F.2d 599 (5th Cir. 1957). While this Court apparently has not faced a situation in which all but one of the voters has departed,[11] we recently enforced a bargaining order in a case in which only four of the 15 voters remained. *Nichols-Homeshield, Inc.,* 214 NLRB 682, 683 (1974), enforced, 519 F.2d 1404 (7th Cir. 1975). See also *National Labor Relations Board v. Washington Manor, Inc.,* 519 F.2d 750 (6th Cir. 1975). The fact that the aliens have departed therefore does not prove that the Union has lost the majority status given to it by the aliens.

In view of our conclusion that the Union's certification was valid, the Board's order will be enforced.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

The majority opinion fully and fairly sets forth the unusual circumstances of this case but in part comes to a conclusion from which I respectfully dissent. I concur with the resolution of the jurisdictional issue, but take a contrary view on the issue of the alienage of the voting employees.

The Board would have us ignore for its purpose the federal immigration laws, and in particular 8 U.S.C. § 1182(a)(14). That section provides that aliens who seek to enter the United States for the purpose of performing skilled and unskilled labor shall be excluded unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that there are not already sufficient workers here available for the work, and that "the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed." That section creates a presumption that aliens should not be permitted to enter this country to perform labor "because of the likely harmful impact of their admission on American

---

10. This case is not analogous to the second type of "unusual circumstance" suggested in *Brooks:* "as a result of a schism, substantially all the members and officers of the certified union transferred their affiliation to a new local or international." 348 U.S. at 98, 75 S.Ct. at 178. In the example suggested in *Brooks,* the nature of the transfer of affiliation and the reasons for the transfer provide a clear indication that sentiment about the union has changed. No such indication is present when employees leave for other reasons.

11. Because the aliens were eligible voters at the time of the election, this case is not one in which there was not a representative number of valid votes (compare *Kit Manufacturing Co.,* 198 NLRB 1 (1972) or one in which there was only one eligible voter. Compare *San Francisco Art Institute,* 226 NLRB 1251 (1976).

workers." *Pesikoff v. Secretary of Labor,* 163 U.S.App.D.C. 197, 201, 501 F.2d 757, 761 (1974), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315. The Board has been given no special dispensation to choose which related laws it may ignore. That does not place the enforcement of the immigration statutes upon the Board. I am not persuaded in this instance by the argument that since the Board's interpretation is one of long standing it is therefore entitled to great weight. I view it as only a case of the Board having been wrong for a long time. That does not mean that something cannot or should not be done about it now for the compelling reasons apparent on the face of the immigration statutes. *Old Ben Coal Corp. v. Interior Board of Mine Operations Appeals,* 523 F.2d 25, 36 (7th Cir. 1975). See also *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978). The purposes of the Board and the immigration laws need not be in conflict as it seems to me they deserve to be blended in their application in seeking to achieve some common goals. Six of the seven eligible voters were illegal aliens and were deported shortly after the election. The six had no right to be here, no right to the jobs, and consequently no right to make determinations binding on the respondents' business long after their deserved departure. That the employer may have had some knowledge of the illegal alien status of the workers I do not consider decisive. It is for Congress to impose liabilities, if desirable, on employers who knowingly hire illegal aliens. I would not presume that immigration officials will fail to fulfill their responsibilities in regard to illegal aliens as difficult as those duties may be at the present time. Nor would I speculate that to require the Board to give consideration to the immigration laws would result in any significant increase in the hiring of illegal aliens by employers for the purpose of defeating unionization. Ordinarily I would expect unions to support immigration enforcement so as to protect their own members.

I would also reach the same result by recognition of the "unusual circumstances" to rebut the fiction that the union continues to enjoy majority status. The majority was deported. *Brooks v. N. L. R. B.,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). Industrial peace, which that case finds to be the underlying purpose of the statute, cannot be much advanced by failing to take into account the unusual circumstance present here. There was no one left, at least temporarily, to carry on the business. A new election among the current employees could easily resolve this controversy in a more satisfactory manner.

I would deny enforcement.