**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SURE–TAN, INC., and Surak Leather Co., Respondent.**

**No. 80–2448.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1981.

Decided Feb. 24, 1982.

As Amended Feb. 26, 1982.

Rehearing and Rehearing En Banc Denied May 5, 1982 with Dissenting Opinion, see 677 F.2d 584.

Catherine Garcia, N.L.R.B., Washington, D. C., for petitioner.

John A. McDonald, Chicago, Ill., for respondent.

Before CUDAHY, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and BROWN,* Senior District Judge.

CUDAHY, Circuit Judge.

When these same respondents were before us several years ago, we noted in passing certain "bogeymen" who now have made a full appearance calling on us for decision in this matter of first impression. See NLRB v. Sure-Tan, Inc., 583 F.2d 355,

* The Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

1. The Board found that both firms constituted a single, integrated employer and respondents have not challenged this finding on appeal. Sure-Tan, Inc., 234 N.L.R.B. 1181, 1189 (1978);

358 n.3 (7th Cir. 1978). In this prior decision involving the same respondent, we held that illegal aliens are "employees" protected by the National Labor Relations Act (the "Act" or "NLRA"). We presently confront the further knotty problem of rectifying the injustice done certain of these aliens, whose labor was gratefully accepted and broadly utilized but whose efforts at labor organization were rebuffed by expulsion from the United States.

Unfortunately, more than five years have passed since the occurrence of the discriminatory acts underlying the order of the National Labor Relations Board (the "Board") in this case. Even more unfortunately, whatever remedy is approved here may have little effect in discouraging employer conduct which violates the rights of employees under the NLRA—conduct which the employer now argues was merely consistent with his duty under the Immigration and Naturalization Act (the "INA").

Respondent Sure-Tan, Inc., and Surak Leather Company ("Sure-Tan") are two small leather processing and sales firms located in Chicago, Illinois.[1] Both firms are owned and operated by Steve and John Surak, and at the times relevant to this case they employed approximately eleven workers. Most of these employees were Mexican nationals in the United States without visas or work permits. A union organization drive began at Sure-Tan in July, 1976, and eight employees signed cards authorizing the Chicago Leather Workers Union, Local 431, Amalgamated Meatcutters and Butcher Workmen of North America (the "Union"),[2] to act as their collective bargaining representative. On August 12, 1976, the Union filed an election petition with the Board and an election was held on December 10, 1976. The Union won the election,

see NLRB v. Sure-Tan, Inc., 583 F.2d 355, 358 (7th Cir. 1978).

2. The Union is currently affiliated with the United Food and Commercial Workers International Union, AFL-CIO.

and on January 19, 1977, the Board notified Sure-Tan that its objections were overruled and that the Union was certified as the employees' collective bargaining representative.

On February 22 and March 23, 1977, the Board's Acting Regional Director for Region 13 issued complaints against Sure-Tan, charging that Sure-Tan violated sections 8(a)(1), 8(a)(3) and 8(a)(4) of the Act by discriminatorily discharging five employees because of their union activities; threatening, interrogating and coercing its employees to discourage them from engaging in protected activities; and discriminatorily reprimanding an employee who filed a complaint with the Board. The case was heard by an administrative law judge (ALJ) who upheld the complaints in all respects. The Board affirmed and adopted the ALJ's findings and conclusions but modified the backpay and reinstatement remedy proposed by the ALJ. We shall discuss separately each issue raised by Sure-Tan with respect both to the merits of the Board's order and the Board's revised reinstatement and backpay remedy. In summary, we find that substantial evidence supports the Board's order in this case, subject to certain modifications of the remedy.

## I.  *Interrogations and Threats*

The ALJ found that on several occasions between August, 1976 (after the Union began its organization efforts), and December, 1976, John Surak threatened, coerced and interrogated various employees about their union support in violation of section 8(a)(1) of the Act. Former employee Floriberto Rodriguez testified that at some time during August, 1976, John Surak approached a group of employees (including Rodriguez) asking in English and Spanish, "You all union?" When Rodriguez responded that they knew nothing about the Union, Surak retorted by calling them "mother fucking son of a bitches" before leaving the room.[3]

Former employee Francisco Robles testified that in October, 1976, John Surak showed him a piece of paper with squares marked "yes" and "no." Surak pointed to the "yes" square and told Robles, "Union no good. Little work." Pointing to the "no" square, Surak told Robles "[T]he Company is good. A lot of work here." Surak then marked the "no" square saying, "O.K. Francisco?" to which Robles replied, "O.K." Robles testified that Surak approached another employee (Primitivo Servantez) in Robles' presence at some time in December before the election and attempted to give that employee similar advice about the "yes" and "no" squares. When Surak was unable to communicate in English with this employee, he asked Robles to translate the message into Spanish. Robles then told Servantez that Surak wanted him to mark the "no" square on his election ballot.

Robles further testified that two hours after the election on December 10, 1976, John Surak addressed a group of employees (which included Robles, Arguimiro Ruiz and Primitivo Servantez) exclaiming "no friends, no amigos," and using the word "immigration." Surak asked the employees, "Union why? Union why?" and he also cursed them saying "Mexican son of a bitch." Surak then asked Robles whether he possessed proper immigration papers; Robles replied that he did not have appropriate documentation. Surak also asked the other employees if they possessed proper immigration papers; Servantez replied, through Robles, that "nobody had papers there."[4] Employee Albert Strong also tes-

**3.** Although not constituting a violation of sections 8(a)(1) or 8(a)(3), the ALJ noted as background evidence of Sure-Tan's anti-union animus another incident in October in which John Surak told Rodriguez that he was "stupid" and that "You and the union are motherfucker son of a bitches." Rodriguez quit his job with Sure-Tan immediately after this incident.

**4.** The General Counsel also presented to the ALJ the affidavits of three other former Sure-

Tan employees who voluntarily departed the United States for Mexico after John Surak informed the immigration authorities that they were probably illegally present in the United States. *See* section III *infra.* These employees did not appear at the hearing and the ALJ did not credit their affidavits even though they recounted similar instances of threats and interrogations. We agree with the ALJ's assessment of this evidence and further note that the evidence would be merely cumulative of the

tified that after the election on December 10, John Surak told him, "Your dream finally came true, but I won't stay in business." [5]

Sure-Tan contends that the ALJ erred by crediting the testimony of Rodriguez, Robles and Strong and that the ALJ's finding of a violation of section 8(a)(1) based upon this testimony is therefore not supported by substantial evidence as required by section 10(e) of the Act, 29 U.S.C. § 160(e) (1976). We must disagree. The only evidence in support of its claim to which Sure-Tan directs our attention is the testimony of John Surak. Surak denied that he made any of the quoted statements or that he threatened or interrogated his employees about their union activities. But the ALJ, who conducted the hearing and observed Surak's demeanor, discredited what he deemed Surak's hesitant and evasive testimony. After reviewing the transcript of the hearing, we cannot conclude that the ALJ erred in discrediting Surak's uncorroborated and self-serving declarations. See NLRB v. Mars Sales & Equipment Co., 626 F.2d 567, 571–72 (7th Cir. 1980). On review, we will fault the Board for accepting an ALJ's credibility determinations only when such determinations are inherently incredible, unreasonable or conflict with the clear preponderance of the evidence. NLRB v. Hospital and Institutional Workers Union, Local 250, 577 F.2d 649, 652 (9th Cir. 1978); see First Lakewood Associates v. NLRB, 582 F.2d 416, 420 (7th Cir. 1978); Electri-Flex Co. v. NLRB, 570 F.2d 1327, 1331–32 (7th Cir.), cert. denied, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). Surak's uncorroborated denials do not meet this standard.

Sure-Tan's contention that Surak's statements do not amount to a violation of section 8(a)(1) is similarly without merit. Under section 8(a)(1), an employer commits an unfair labor practice by "interfer[ing] with, restrain[ing], or coerc[ing]

employees in the exercise of the rights guaranteed in section 7 [of the Act]." 29 U.S.C. § 158(a)(1) (1976). Proof of successful interference, restraint or coercion is unnecessary; a violation of section 8(a)(1) is demonstrated by an employer's conduct which tends to interfere with the rights of employees to organize a union. Jays Foods, Inc. v. NLRB, 573 F.2d 438, 444 (7th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). The ALJ was more than justified in concluding that Surak's instructions to Robles and Servantez, implying that a "yes" vote (approving union representation) would result in "little work," constitutes a threat within the ambit of section 8(a)(1). Although free to predict the economic consequences of unionization, an employer unlawfully threatens his employees when he warns of an adverse economic impact without providing an objective basis for the employees to believe that the predicted result is not caused solely at the employer's initiative. NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969); NLRB v. Gogin, 575 F.2d 596, 600–01 (7th Cir. 1978).

Moreover, the ALJ justifiably concluded that Surak unlawfully interrogated his employees when he questioned them about their support of unionization. Interrogation violates section 8(a)(1) when, properly viewed in the context of an employee-employer relationship, the employer's questioning may have reasonably induced fear in the employees causing them to refrain from assisting a union. NLRB v. Gogin, 575 F.2d 596, 600 (7th Cir. 1978); Satra Belarus, Inc. v. NLRB, 568 F.2d 545, 547–48 (7th Cir. 1978). Surak's questions about union support, followed by ethnic slurs, inquiries into the employees' immigration status, occasional ascriptions of canine ancestry and other expressions of Surak's anti-union animus are unarguable and flagrant examples of interrogation prohibited by section 8(a)(1).

already sufficient proof supporting the complaint.

**5.** Albert Strong was discriminatorily discharged in violation of section 8(a)(3) by Sure-

Tan's predecessor (also owned and operated by the Surak brothers) for his support of an organizational drive. See National Rawhide Manufacturing Co., 202 N.L.R.B. 893 (1973).

## II. Additional Threats and Layoffs

The ALJ also found that Sure-Tan violated sections 8(a)(1), 8(a)(3) and 8(a)(4) of the Act, 29 U.S.C. §§ 158(a)(1), (3) & (4) (1976), by reprimanding employee Albert Strong for filing a complaint with the Board. Strong testified that on or about January 31, 1977, he filed a complaint at the local Board office alleging that he had been discriminatorily laid off by Sure-Tan for several weeks after the union election. Shortly after he filed this complaint, John Surak approached Strong at work and berated him for filing the complaint. Steve Surak then joined in, echoing his brother's claim that Strong was a "dirty son of a bitch" and stating to Strong that "You are trying to get money like you did before." [6] Several days after this incident, John Surak called Strong a "lazy punk" for failing to move some bags of chemicals. Strong responded by telling Surak that he intended to report Surak to the Board. Later that same day, Steve Surak gave Strong a letter of reprimand.[7] This was the first letter of reprimand issued to Strong in his 11 years of employment with the Surak brothers.

The ALJ concluded that the Surak brothers' verbal harassment of Strong shortly after he filed a complaint with the Board and the subsequent letter of reprimand [8] were motivated by Strong's long-standing union support and his effort to invoke the Board's legal processes and, thus, violated sections 8(a)(1), 8(a)(3) and 8(a)(4). Sure-Tan contends that the ALJ erred by crediting Strong's testimony as against the Surak brothers' denial that any of these statements were ever made. The ALJ's credibility determinations must stand, especially when the only contrary evidence consists of the Surak brothers' own self-serving denials.[9] *See NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567, 571–72 (7th Cir. 1980).

We also reject Sure-Tan's argument that these findings, which are supported by substantial evidence on the whole record, do not establish violations of sections 8(a)(1), 8(a)(3) and 8(a)(4). The ALJ justifiably concluded that the Surak brothers' threatening remarks and written reprimand addressed to Strong shortly after he filed charges (or, more precisely, indicated his intention to file additional charges) impeded Strong's exercise of protected rights and his access to the Board in violation of sections 8(a)(1) and 8(a)(4). *See NLRB v. Scrivener*, 405 U.S. 117, 121–25, 92 S.Ct. 798, 801–03, 31 L.Ed.2d 79 (1972); *NLRB v. Intertherm, Inc.*, 596 F.2d 267, 275–76 (8th Cir. 1979). *See generally Glenroy Construction Co. v. NLRB*, 527 F.2d 465, 468 (7th Cir. 1975). Moreover, the ALJ correctly found, in light of the Surak brothers' demonstrated anti-union animus and the fact that their disciplinary reprimand followed closely on the heels of Strong's resort to Board processes, that the reprimand was discriminatorily motivated and thus violated section 8(a)(3). *See Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1334–35 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). The ALJ's inference seems even more justifiable in view of the circumstances that Strong had never before been reprimanded during his long and sometimes checkered tenure with the Surak

---

**6.** This statement apparently referred to the previous charge filed by Strong against the Surak brothers. *See* note 5 *supra*.

**7.** The letter stated:
> This note is to warn you that we are not satisfied with your work. You do not follow the orders and your attitude toward work is very negative. If you will not change this conduct we will terminate your job.

**8.** The ALJ found, and we concur, that the "lazy punk" incident (together with another similar contemporaneous name-calling occurrence not described here) was in itself rather trivial and does not merit an unfair labor practice charge. However, the Surak brothers' subsequent letter of reprimand clearly constituted, as the ALJ found, an overreaction to this minor work dispute. Hence, we will not overturn the Board's finding that the reprimand was motivated by Strong's support of the Union and his recourse to Board processes.

**9.** Indeed, this was not the first time that an ALJ chose to credit Strong's testimony vis-a-vis the Surak brothers. *See National Rawhide Manufacturing Co.*, 202 N.L.R.B. 893, 895–98 (1973).

brothers. The Suraks' only excuse for this disciplinary action—the alleged insubordination—was clearly pretextual. *See Berbiglia, Inc. v. NLRB*, 602 F.2d 839, 843–45 (8th Cir. 1979).

### III. *Constructive Discharge*

On January 17, 1977, the Board's Acting Regional Director overruled Sure-Tan's objections to the representation election and certified the Union as the collective bargaining agent for Sure-Tan's employees. Sure-Tan received notice of the Acting Regional Director's decision on January 19. On the next day, January 20, 1977, John Surak sent the following letter to the Immigration and Naturalization Service (INS):

> We would like to ask you to check the emigration [sic] status of several [of] our employees, who are Mexican nationals: Juan P. Florez, also known as Jose Martinez, Social Security Number 338–50–1497
>
> Francisco Robles, Social Security Number 466–11–2550
>
> Ernesto Arreguin, Social Security Number 357–48–2329
>
> Sacremento Serrano, Social Security Number 236–47–5634
>
> Arguimiro Ruiz, Social Security Number 548–06–8995
>    \* \* \* [10]
>
> We appreciate your attention to this request as soon as possible.
>
>        Yours very truly,
>        SURE–TAN, INC.
>        V. J. Surak

INS agents visited Sure-Tan's premises on February 18, 1977, to check the immigration status of all Spanish-speaking employees. After a short investigation and an interview with Sure-Tan's employees, the INS agents discovered that each of the five employees listed in the quoted letter were living and working illegally in the United States. These employees were then arrested by the INS agents and removed from Sure-Tan's premises. Later that same day, each employee executed an INS Form I–274, by which he acknowledged that he was a Mexican citizen illegally present in the United States. By executing this form, each employee also accepted the INS' grant of voluntary departure as a substitute for deportation.[11] Thus, by the end of the day, each of these former Sure-Tan employees, at his own expense, was placed aboard a bus bound for El Paso, Texas.

■ The Board concluded that Sure-Tan constructively discharged these five employees, in violation of sections 8(a)(1) and 8(a)(3), by sending this letter to the INS in retaliation for union activity. Sure-Tan counters this conclusion by arguing that at the time the letter was sent, John Surak had only "doubts" about his employees' immigration status, and that the "deportation" of the employees was the "proximate result" of their illegal status rather than Surak's letter to the INS. We reject Sure-Tan's contentions and affirm the Board's conclusion that Sure-Tan's actions amounted to constructive discharge.

■ The principle determining liability under section 8(a)(3) is that the employer's conduct affecting an employee's hire, tenure or terms of employment must be motivated, at least in part, by anti-union considerations. *Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1331 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978); *Satra Belarus, Inc. v. NLRB*, 568 F.2d 545, 548 (7th Cir. 1978). The existence of a discriminatory motive is a question of fact which the factfinder may resolve by relying on both direct and circumstantial evidence. *NLRB v. Gogin*, 575 F.2d 596, 601 (7th Cir. 1978). Of course, the substan-

---

**10.** The letter also listed several other individuals whose names are not included here because they are not involved in the current charges.

**11.** Contrary to the apparent assumption of the ALJ, the Board, the General Counsel and counsel for Sure-Tan, these employees were *not* deported but instead left this country on a grant of voluntary departure. General Counsel's Exhibits 20–25; *see* 8 U.S.C. § 1254(e) (1976); 8 C.F.R. § 242.5 (1981). This fact is of considerable significance for our analysis of Sure-Tan's arguments regarding the reinstatement and backpay remedy. *See* section IV *infra*.

tial evidence standard applies to our review of this question, *Gogin,* 575 F.2d at 602, and we shall accord appropriate weight to the Board's findings and conclusions. *See Electri-Flex,* 570 F.2d at 1331–32.

■ In assessing Sure-Tan's motive for sending the letter to the INS, we first note that both before and after the election, John Surak engaged in various sorts of unlawful conduct (primarily threats and interrogations directed toward his Spanish-speaking employees) which clearly reflected a bald anti-union animus. This evidence of contemporaneous unfair labor practices is highly relevant in establishing motive under section 8(a)(3). *See NLRB v. Tom Wood Pontiac, Inc.,* 447 F.2d 383, 386 (7th Cir. 1971).

Sure-Tan argues, however, that neither of the Surak brothers knew their employees were illegal aliens (although the brothers admit to doubts in the matter). Hence, the Suraks assert they merely performed their civic duty in writing the INS. But the Board found, and the great weight of the evidence supports the Board's finding, that John Surak was well aware that his employees were illegally residing in the United States. Employees Robles and Servantez told Surak shortly after the election that none of his employees possessed the proper immigration papers. Moreover, Surak executed an affidavit on January 10, 1977—10 days before he sent the letter to the INS—stating that a confidential source told him several months *before* the election that "these men were illegally here." General Counsel's Exhibit 32. Finally, Surak's counsel at the time of the election (who is also counsel for Sure-Tan on this appeal) twice admitted in statements filed with the Board in December following the election (but before the certification of the Union) that one of the grounds for objecting to the election was that "[s]ix of those seven voters are unlawfully residing and working in the United States, those persons being Mex-

ican Nationals who have not received permission or right . . . to reside and work within the United States." General Counsel's Exhibit 11, p. 1; *see* General Counsel's Exhibit 12, pp. 1–2 (wherein Sure-Tan admits that Surak confirmed the illegal status of his employees by personally quizzing each about his immigration status). Quite apart from any doubts we may have of the accuracy of Sure-Tan's affidavits filed with the Board and its assertions on this appeal, we are, based upon inconsistent factual positions taken at one time or another by the Suraks,[12] unwilling to overturn the Board's conclusion that "John Surak . . . was aware that most of his employees were illegal aliens." 234 N.L.R.B. at 1190 (footnote omitted).

■ Sure-Tan also challenges the ALJ's finding of a section 8(a)(3) violation by arguing that the letter to the INS does not amount to a "constructive discharge." Section 8(a)(3) is violated only when the employer's discrimination affects "hire," "tenure" or a "term or condition of employment." 29 U.S.C. § 158(a)(3) (1976). Constructive discharge occurs, and may give rise to a section 8(a)(3) violation, even though the employer does not directly or forthrightly terminate an employee but rather creates working conditions so intolerable that the employee is forced to resign. *See Cartwright Hardware Co. v. NLRB,* 600 F.2d 268, 270 (10th Cir. 1979); *J. P. Stevens & Co. v. NLRB,* 461 F.2d 490, 494 (4th Cir. 1972). For purposes of section 8(a)(3), two elements are required to establish a constructive discharge. "First, the employer's conduct must have created working conditions so intolerable that an employee is forced to resign. Second, the employer must have acted 'to encourage or discourage membership in any labor organization' within the meaning of section 8(a)(3) of the Act." *NLRB v. Haberman Construction Co.,* 641 F.2d 351, 358 (5th Cir. 1981) (en banc) (quoting 29 U.S.C. § 158(a)(3) (1976));

**12.** We note that the argument advanced by counsel on this appeal regarding the Surak brothers' knowledge of the illegal alien status of these employees borders on the ludicrous

when considered in connection with the prior affidavits of fact procured by this same counsel.

accord *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 32–34, 87 S.Ct. 1792, 1796–1797, 18 L.Ed.2d 1027 (1967).

■ Sure-Tan's argument here that any intolerable condition forcing termination was created by the employees' status as illegal aliens is specious. By putting the INS on notice of these alien employees when it knew of their illegal status, Sure-Tan took action which was the proximate cause of their departure. Indeed, the INS agent who conducted the investigation testified that John Surak's letter "precipitated" his inspection and investigation. Surak, when he sent this letter, surely foresaw and intended the ultimate result of the INS' investigation. Moreover, we reject Sure-Tan's argument that it was legally obligated to disclose the presence of the alien employees to the INS. Sure-Tan has not cited, nor has our research disclosed, any provision in the INA which requires an employer to notify the INS that he employs illegal aliens.[13] Although there is some authority that "[a]n employer who suspects that an employee is in the United States without proper authority should report this information to the INS," *NLRB v. Apollo Tire Co.*, 604 F.2d 1180, 1183 (9th Cir. 1979), an employer has no right to rely on a "moral obligation" to report illegal aliens (of which he has been previously oblivious) merely to sanctify an otherwise unjustifiable violation of section 8(a)(3). *See NLRB v. Sure-Tan, Inc.*, 583 F.2d 355, 360 n.9 (7th Cir. 1978).[14] A contrary holding would encourage employers to hire illegal aliens, who would for all practical purposes be stripped of NLRA protection and who could be fired with impunity at the first hint of union sympathy.

■ The second requirement of the *Haberman* test—that the employer has acted with an anti-union animus—is also flagrantly met in this case.[15] The record is replete with examples of Sure-Tan's blatantly illegal course of conduct to discourage its employees from supporting the Un-

13. Under the current statutory scheme, the *alien* who unlawfully enters this country to seek employment without obtaining proper certification violates the INA. *See* 8 U.S.C. § 1182(a)(14) (Supp. I 1977). An alien's illegal status under the INA does not, as Sure-Tan contends, immunize an employer's constructive dismissal of an alien employee which is motivated by anti-union animus. Although an alien's inability to procure proper authorization from the INS to reside and work in the United States might, standing alone, constitute sufficient grounds for discharge, there is no authority under the NLRA or the INA sanctioning a constructive discharge which is otherwise invalid under section 8(a)(3), based on the employee's status as an illegal alien. Even if the instant case could properly be classified as a "mixed motive" case because of the presence of a potentially justifiable reason for the constructive discharge, we believe that the General Counsel clearly sustained his burden of demonstrating an illegal motive under the Act for Sure-Tan's conduct, and Sure-Tan has not rebutted this evidence. Specifically, Sure-Tan has not shown that absent anti-union animus, it would have engineered these employees' departures. *See NLRB v. Eldorado Mfg. Corp.*, 660 F.2d 1207 (7th Cir. 1981).

14. We are not so naive as to believe that Sure-Tan does not share some practical blame in this case for any alleged violation of the immigration laws. We find it difficult to believe that a metropolitan Chicago employer can employ a work force almost exclusively made up of Spanish-speaking men of Mexican origin at wages within pennies of the minimum wage (and at hard and unappetizing work) without even suspecting that some of these employees are illegal aliens. There seems nothing like a successful union election to concentrate an employer's mind on the color of its workers' visas (if they exist) and on its moral obligations to expel its (once faithful) employees from the country.

15. We note that proof of an anti-union motive is not required under the second part of the *Haberman* test when the employer's conduct is inherently destructive of employee rights. *Haberman*, 641 F.2d at 359–60. The employer's conduct in the instant case is properly characterized as inherently destructive of employee rights because Sure-Tan's letter to the INS, which lead to the voluntary departure of at least half of Sure-Tan's work force, effectively "jeopardize[d] the position of the union as bargaining agent or diminishe[d] the union's capacity ... to represent the employees in the bargaining unit." *Haberman*, 641 F.2d at 359. Notwithstanding the attractiveness of this analysis, we think that in this case of first impression, we should carefully analyze Sure-Tan's allegations that no anti-union animus capable of supporting a section 8(a)(3) violation is present in this case.

ion. We have already concluded that the Surak brothers threatened, coerced and interrogated their employees in violation of sections 8(a)(1), 8(a)(3) and 8(a)(4). In a related proceeding, another panel of this court has held that Sure-Tan violated section 8(a)(5) of the Act by refusing to bargain with the Union after the INS granted voluntary departures to the five employees who are the subjects of this appeal. *NLRB v. Sure-Tan, Inc.*, 583 F.2d 355 (7th Cir. 1978). The close time relationships involved shed a clear light on Sure-Tan's motives. Sure-Tan sent the letter to the INS only *one day* after receiving the Regional Director's order overruling Sure-Tan's objections to the election and requiring Sure-Tan to bargain with the Union. Sure-Tan's deathbed conversion to enthusiastic enforcement of the immigration laws, which, of course, coincided with the Union's victory in the representation election, can hardly provide it with any defense under section 8(a)(3). In fact, in this case as probably in others the immigration laws have provided an employer with a powerful tool for unfair and oppressive treatment of migrant labor. The immigration laws have been conveniently employed to impose the ultimate penalty of discharge (and deportation or its equivalent) if migrant laborers should have the effrontery to join a union. As Chief Judge Cummings noted in our first *Sure-Tan* case, "it ill becomes the Company to argue after losing the election that certification would conflict with the immigration laws." 583 F.2d at 360.

We think the Board correctly concluded that Sure-Tan constructively discharged these five employees in violation of section 8(a)(3).

## IV. *Remedy*

The most difficult problem presented on this appeal is the appropriateness of the relief ordered by the Board for the five constructively discharged alien employees. The ALJ concluded that the conventional remedy of backpay and reinstatement was "inadequate" in this case because the constructively discharged employees were illegal aliens "deported" to Mexico. 234 N.L.

R.B. at 1192. In place of the conventional remedy, the ALJ recommended that the Board order Sure-Tan to mail letters to the five discriminatees at their last known addresses in Mexico, offering them reinstatement to their former or equivalent positions; these offers were to remain open for six months. The ALJ declined to recommend an award of backpay "[s]ince the above employees were not available for employment." 234 N.L.R.B. at 1192–93.

The Board refused to adopt the ALJ's recommended remedy. Noting that there was no evidence in the record supporting the ALJ's conclusion that the discriminatees have not returned to the United States, the Board concluded that the question of availability for work should be determined in a compliance proceeding. Thus, the Board modified the ALJ's order by substituting the "conventional remedy of reinstatement with backpay." 234 N.L.R.B. at 1187.

The General Counsel subsequently filed a motion for clarification with the Board directed solely at the remedy. Although admitting "that certain . . . remedial issues in this case may ultimately involve factual matters which are best resolved in a compliance proceeding," the General Counsel argued that Sure-Tan "is uncertain as to what its obligations are, and thus has questions concerning what it must do to achieve compliance." In particular, the General Counsel suggested that the Board's order might violate the national immigration laws and policies because it requires reinstatement and backpay without regard to the legality of the discriminatees' immigration status. Because he thought that such an interpretation "must be wrong," the General Counsel suggested that the Board adopt one of several other remedial formulas which would presumably not conflict with immigration laws or policies.

The Board denied the General Counsel's clarification motion. *Sure-Tan, Inc.*, 246 N.L.R.B. 788 (1979). Noting "that the remedial policies of the Act will be best effectuated in this case by affording the discriminatees full protection notwithstanding the circumstances attendant to their illegal dis-

charge," the majority explained that the usual procedures governing the backpay and reinstatement claims, as implemented in a compliance proceeding, were both sufficient and appropriate for this case. 246 N.L.R.B. at 788. Members Penello and Murphy dissented, arguing that by failing to distinguish between lawfully and unlawfully resident discriminatees, the Board's order encouraged aliens to enter the country illegally to secure their reinstatement and backpay.

Upon the Board's application to enforce its order, Sure-Tan argues that the award of reinstatement and backpay, without regard to the immigration status of the employees seeking reinstatement, defeats the policies of our immigration laws and fails to carry out the policies of the NLRA. Sure-Tan also contends that a letter it sent to the five discriminatees offering them reinstatement "provided only that [their] reemployment shall not subject Sure-Tan, Inc. to any violations of United States immigration laws" was an unconditional offer of reinstatement and, thus, Sure-Tan has satisfied the Board's requirements in this regard. We separately consider each of these contentions.

### A. *Propriety of Backpay and Reinstatement*

We reject Sure-Tan's argument that under the circumstances of this case an award of reinstatement and backpay cannot be reconciled with the laws and policies governing both immigration and labor relations. Sure-Tan's objection to the Board's

remedial order, relying on the immigration laws, is premised in part on the assumption that the five discriminatees were deported. By awarding these "deported" discriminatees backpay and reinstatement, Sure-Tan contends that the Board has encouraged these aliens to re-enter the United States, even though the re-entry of deported aliens is a felony. *See* 8 U.S.C. § 1326 (1976). As we noted in section III, *supra*, the INS did not *deport* the discriminatees; rather, the INS granted to them the privilege of *voluntary departure*. General Counsel's Exhibits 20–25; *see* 8 U.S.C. § 1254(e) (1976). Aliens who depart voluntarily avoid the stigma of deportation and enhance the possibility of their lawful return to the United States at a later date. *Jain v. INS*, 612 F.2d 683, 686 n.1 (2d Cir. 1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980); *Strantzalis v. INS*, 465 F.2d 1016, 1017 (3d Cir. 1972) (per curiam); *Tzantarmas v. United States*, 402 F.2d 163, 165 n.1 (9th Cir. 1968), *cert. denied*, 394 U.S. 966, 89 S.Ct. 1312, 22 L.Ed.2d 569 (1969).[16] Because these discriminatees were not deported, the felony provisions of 8 U.S.C. § 1326 are not applicable, and the Board correctly concluded that they might return lawfully to this country to reclaim their positions at Sure-Tan.[17] The Board also determined that such a lawful return might take place soon.

■ It obviously remains a possibility, however, that the discriminatees in this case might be motivated to reenter the United States unlawfully to claim reinstatement and backpay. But, as a practical mat-

---

**16.** Deported aliens may reenter the United States only if they first secure the Attorney General's consent for reapplication for admission. 8 U.S.C. § 1326(2) (1976). Aliens who voluntarily depart need not secure prior approval from the Attorney General before seeking admission; likewise they are not necessarily prohibited from reapplying for admission to this country. Indeed, there is nothing in the INS regulations governing the certification of temporary alien workers, such as the alien discriminatees in this case, that prohibits the INS from lawfully certifying these discriminatees for admission in the future upon reapplication notwithstanding a previous voluntary departure. *See* 8 C.F.R. § 212.8 (1981).

**17.** This point also distinguishes the instant case from *Southern Steamship Co. v. NLRB*, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942). In *Southern Steamship*, the Court held that the Board's remedial order of backpay and reinstatement for striking seamen was unenforceable because it conflicted with another statute prohibiting strikes or mutinies by seamen by encouraging these prohibited acts. In the instant case, the Board's order does not conflict with the immigration laws since it does not necessarily encourage or sanctify *illegal* immigration of the discriminatees from Mexico.

ter we believe it unlikely that a discriminatee would attempt to illegally enter the United States primarily to pursue his remedies and thus draw attention to his illegal alien status. Indeed, the economic and social attractions which generally encourage illegal migration to this country are probably more compelling inducements than the special fruit of the Board's order might be in this case. Thus, under the specific facts of this case, the Board's grant of the conventional remedy of backpay and reinstatement does not clearly flout the immigration laws (although here, as explained *infra*, we think that the Board's remedy should be modified in some aspects).

We also reject Sure-Tan's argument that backpay and reinstatement for these discriminatees would not carry out the purposes of the NLRA. Section 10(c) of the Act grants to the Board broad discretion in devising remedies for unfair labor practices. *See NLRB·v. United Contractors, Inc.*, 614 F.2d 134 (7th Cir. 1980); *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596 (9th Cir. 1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). Sure-Tan correctly notes that in most cases where reinstatement orders are not upheld, the reinstated employees were guilty of unlawful or offensive conduct. *See, e.g., NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939); *Nebraska Bulk Transport v. NLRB*, 608 F.2d 311, 316–17 (8th Cir. 1979); *NLRB v. National Furniture Manufacturing Co.*, 315 F.2d 280, 286 (7th Cir. 1963). These authorities teach, however, that an employee's unlawful or offensive conduct, to be of significance, must relate directly either to his ability to perform his work duties or to the compatibility between employer and employee. The immigration violations of these discriminatees, though unlawful (and conceivably "offensive"), have no bearing

on the employees' ability to perform Sure-Tan's work. Nor is there any showing (relating to immigration status or otherwise) that any basic antagonism exists which interferes with harmonious employer-employee relations.

Moreover, the purpose of backpay in cases such as this is to vindicate public policy by making employees whole for their losses caused by the employer's unfair labor practices. *NLRB v. J. H. Rutter-Rex Manufacturing Co.*, 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969). It would be anomalous to encourage the honest toil of illegal aliens, accepting it with the understanding that these workers had the rights of employees under the Act, but then, when violations occur, to deny them such rights by refusing effective remedies. Indeed, the rights of *both* alien and non-alien employees under the Act are flouted if employers are free to discriminate against alien employees who exercise their right to form and join unions. This is precisely what happened here since Sure-Tan, by constructively discharging these alien employees, destroyed the bargaining unit and thus undermined the Union's support during the crucial period immediately after certification. Both reinstatement and backpay are justified under the circumstances to vindicate the policy of the Act and to deter similar conduct by other employers in the future.[18] We, however, believe that both branches of this conventional remedy must be subjected to limitations as set forth *infra*.

### B. Sure-Tan's Offer Of Reinstatement and Modification of Conventional Remedy

On March 29, 1977, Sure-Tan mailed letters to the five discriminatees. In these letters, Sure-Tan offered to reinstate each discriminatee "provided . . . that [his]

---

**18.** Sure-Tan also argues that the Board erred by determining that many of the remedial issues in this case, including the apparent conflicts between the Board's conventional remedy and the INA, should not be resolved until the Board's order is implemented in a compliance proceeding. In view of our disposition of this case, *infra*, we need not discuss these conten-

tions. Nevertheless, we note that many other issues in this case, such as computation of the dollar amount of backpay and unavailability for employment (which may toll backpay) are usually determined only in compliance proceedings. *Zims Foodliner, Inc. v. NLRB*, 495 F.2d 1131 (7th Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974).

reemployment shall not subject Sure-Tan, Inc. to any violations of United States immigration laws." Company Exhibit No. 1. The offer remained open until May 1, 1977. The letters were written in English and mailed to each discriminatee at his last known address in Mexico. There is not proof, however, that any of the discriminatees actually received Sure-Tan's letter.

The ALJ found that these letters did not constitute adequate offers of reinstatement. As part of his proposed order, the ALJ recommended that Sure-Tan make another offer of reinstatement (with receipt to be verified) to these employees, which would be kept open for a six month period. The Board, "[w]ithout passing on these points," found "that the [employer's] offers were deficient because they were expressly conditioned on [Sure-Tan's] not being found in violation of United States immigration laws." 234 N.L.R.B. at 1187 n.3. Sure-Tan contends that these letters were unconditional offers of reinstatement since the stated condition—reemployment which does not subject Sure-Tan to legal liability under the immigration laws—is not a legal impediment preventing reinstatement. We think that as a practical matter, Sure-Tan is correct in its contentions.

■ When an unconditional offer of reinstatement is made to discriminatees who were discharged due to an employer's unfair labor practice, the employer's backpay liability is generally tolled from the time of the offer. *NLRB v. Huntington Hospital, Inc.*, 550 F.2d 921, 924 (4th Cir. 1977); *Kenston Trucking Co. v. NLRB*, 544 F.2d 1165 (2d Cir. 1976) (per curiam). In this case, the Board held that Sure-Tan's March 29 letters were *conditional* offers of reinstatement; thus, at the present time Sure-Tan has not yet, according to the Board, tolled its backpay liability.

Sure-Tan properly argues that the conditions expressed in its letter are not legal impediments barring the reinstatement of the discriminatees. Because an employer does not violate the immigration laws by employing an illegal alien, these discriminatees could not subject Sure-Tan to any legal liability by applying for, or receiving, reinstatement. Whether or not the "condition" contained in this reinstatement offer constitutes a legal impediment to these discriminatees does not, however, dispose of the issue before us. In determining whether a reinstatement offer is conditional or unconditional, we should not consider either the legal effect of the condition or even the employer's good faith in making the offer. Rather, we must focus on the understanding of an alleged condition by discriminatees who received the reinstatement offers. *See NLRB v. Murray Products, Inc.*, 584 F.2d 934, 942 (9th Cir. 1978).

■ Following this approach, we do not agree with the Board's determination that Sure-Tan's reinstatement offer would be understood by the discriminatees as a "conditional" offer of reinstatement. The discriminatees were well aware, at least after their voluntary departure (if not before), that they can legally work and reside in the United States only if they secure the proper visas and other authorizations. Therefore, the "condition" expressed in Sure-Tan's letter would in all likelihood be construed by persons in the position of these discriminatees as requiring them to enter the country legally before seeking reinstatement. Moreover, in a setting where anti-union animus is not present and since illegal entry would presumably represent just cause for discharge, the employer may presumably refuse lawfully to rehire a previously discharged alien· if the alien has not entered the country legally to reclaim his job. *See* 29 U.S.C. § 160(c) (1976).

This analysis points to a reconciliation of the remedies of backpay and reinstatement with the policies underlying the national immigration laws. As previously noted, we are not convinced that these conventional remedies (as applied here by the Board) would necessarily encourage illegal immigration. Nevertheless, particularly because of the attention now focused by the government on these discriminatees and their employer, it is appropriate for this employer to remind the discriminatees that they may not legally enter the United States to claim

these jobs without proper documents. Despite its frailties of draftsmanship, we believe Sure-Tan's offer, at least for the purposes of this case, should be regarded as unconditional. Further, and consistent with our analysis of Sure-Tan's reinstatement offer, we think the Board's remedial order must be modified to require reinstatement only if the discriminatees are legally present and legally free to be employed in this country when they offer themselves for reinstatement.

On the other hand, we agree with the ALJ that Sure-Tan's letter did not give the discriminatees a reasonable time to consider the offer and make arrangements for legally entering the United States. *See NLRB v. Murray Products, Inc.*, 584 F.2d 934, 940 (9th Cir. 1978). But, we disagree with his recommendation that the offer be left open only for a six month period. Under the circumstances of this case (where legal re-entry into the United States may require years of effort), the offer should remain open for a period of four years to afford the discriminatees a liberal but reasonable opportunity to reclaim their jobs. Moreover, we agree with the ALJ that the offers made by Sure-Tan were inadequate because they were not delivered to the discriminatees in a manner allowing verification of receipt and they were not written in the discriminatee's native language (Spanish). Because its offers were defective to this extent, Sure-Tan must again make offers of reinstatement to the discriminatees consistent with this opinion and the Board's order as we have modified it. The new offers, rather than the earlier ones, will terminate the possible accrual of backpay.

Consistent with our requirement that there be reinstatement only if the discriminatees are legally present and permitted by law to be employed in the United States, we modify the Board's order so as to make clear (1) that (except for the modification hereinafter permitted) in computing back-

pay discriminatees will be deemed unavailable for work during any period when not lawfully entitled to be present and employed in the United States, and (2) that backpay need not be placed in escrow for more than one year.[19]

We have one further concern, in view of the statutory direction that the Board shall order such remedial action as will effectuate the policies of the Act. *See* 29 U.S.C. § 160(c). In the circumstances of this case it may well be that the discriminatees will not have been lawfully available for employment in the United States prior to the date of the new offers of reinstatement which will be required. In that event the discriminatees will receive no backpay. It seems to us that it would better effectuate the policies of the Act to set a minimum amount of backpay which the employer must pay in any event, because it was his discriminatory act which caused these employees to lose their jobs. Although later independent detection of them by INS would doubtless have had the same result, we think the Board could fix a time which is the minimum during which the discriminatees might reasonably have remained employed without apprehension by INS, but for the employer's unfair labor practice. Although that period of time is obviously conjectural, we think that six months is a reasonable assumption. In any event, we believe six months' backpay is a minimum amount for purposes of effectuating the policies of the Act.

We will therefore enforce the Board's order as modified, but will give leave to the Board, if it sees fit, to modify it further by setting a minimum period of six months during which backpay will be awarded in any event, and we will also grant enforcement of the order as so modified.

ORDER ENFORCED AS MODIFIED.

---

19. The Board should utilize a slightly modified escrow procedure similar to the procedure followed in *NLRB v. Brown & Root, Inc.*, 311 F.2d 447 (8th Cir. 1963), *clarified*, 327 F.2d 958 (8th Cir. 1964), to insure that amounts deposited in escrow by Sure-Tan to comply with its backpay liability, if any, will be refunded if the discriminatees fail to make an application for backpay within one year.