**DEL REY TORTILLERIA, INC.,
Petitioner, Cross–
Respondent,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent, Cross–
Petitioner,**

and

**Local 76, affiliated with the International
Ladies' Garment Workers' Union, AFL–
CIO, Intervenor–Respondent, Intervenor–Cross–Petitioner.**

Nos. 91–1934, 91–2286.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1992.

Decided Oct. 22, 1992.*

Donald S. Shire, Sol. Gen., Dept. of Labor, Office of Sol., Washington, D.C., Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., Aileen A. Armstrong, Nancy J. Gottfried (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., for petitioner.

Irving M. Geslewitz, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill. (argued), for respondent.

William A. Widmer, III, Carmell, Charone, Widmer, Mathews & Moss, Chicago, Ill., for intervenor-petitioner.

### ORDER

On consideration of the grant of the petition for rehearing, this court withdrew its opinion in this case issued on July 17, 1992, to allow circulation to the entire court pursuant to Circuit Rule 40(f). As a result of that circulation,

IT IS ORDERED that the opinion of this court originally issued on July 17, 1992, and withdrawn on October 16, 1992, is hereby reissued and amended by the addition of the following footnote on page 1115, noted after reissue date:

Before BAUER, Chief Judge, CUDAHY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In this case the National Labor Relations Board ("the Board") asks us to enforce its order requiring Del Rey Tortilleria, Inc.

("the Company") to pay backpay to two employees it discharged. The Company cross-petitions for review of that order, in part on the ground that it is inconsistent with *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984). Because we agree with the Company that the Board's order is inconsistent with *Sure–Tan*, we deny enforcement.

On June 7, 1985, following the filing of an unfair labor practice charge by Local 76, affiliated with the International Ladies' Garment Workers' Union, AFL–CIO ("the Union"), the Board's Regional Director for Region 13 issued an unfair labor practice complaint against the Company. The complaint alleged, *inter alia*, that the Company had discharged employees Bernardo Bravo and Nicolas Paredez [1] in violation of the Act.

Later that month, the Board's General Counsel, the Company and the Union reached a settlement. In the settlement stipulation, the Company did not admit to engaging in any unfair labor practices, but agreed to reinstate and make whole Bravo and Paredez. The Company also waived all further proceedings except a compliance hearing to determine any issues relating to reinstatement and backpay. In accordance with the stipulation, the Board sought enforcement of its order in this court. On September 23, 1986, we entered judgment in favor of the Board, enforcing its order.

After the stipulation, the Company contested the employees' entitlement to reinstatement and backpay on several grounds, and also contested the amount of backpay owed to the employees. The Company's principal argument was that the employees had no entitlement to backpay under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, because they were undocumented aliens. Shortly thereafter, the Regional Director issued a Backpay Specification and Notice of Hearing seeking reinstatement and liquidated amounts of backpay for the two employees. At the hearing before an administrative law judge, the parties stipulated that Bravo and Paredez were undocumented aliens during their employment with the Company. Moreover, Bravo and Paredez testified that they had applied for legalization under the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. §§ 1101 *et seq.*, based on their beliefs that they qualified for legalization.[2]

On December 7, 1988, the ALJ issued her decision. She concluded that Bravo and Paredez were entitled to full backpay for all periods after their termination and before the Company offered reinstatement, notwithstanding their undocumented alien status. In her opinion, the ALJ relied on *Local 512, Warehouse and Office Workers' Union v. NLRB*, 795 F.2d 705 (9th Cir.1986), which held that *Sure–Tan*'s remedial holding applied only to aliens who are not present within the United States. She therefore found that undocumented aliens who remain in the United States are eligible to receive backpay. The ALJ further found that such aliens were entitled to reinstatement and backpay unless the employer could prove their illegal presence by means of a final INS deportation order. Because the Company had not met that burden, the ALJ ruled that Bravo and Paredez must be presumed to have been legally present at all times and entitled to the full panoply of Board remedies. The ALJ determined that Bravo and Paredez should be awarded backpay for the periods in which they were available for work.

On March 27, 1991, the Board issued its supplemental decision and order, adopting the recommended order of the ALJ. This appeal followed.

1. Nicolas Paredez is also known as Gorgonio Hernandez. At the backpay hearing, the parties learned that Paredez used the name Gorgonio Hernandez when he worked for the Company.

2. Paredez also submitted a temporary resident card issued to him by the INS on January 26, 1988, which indicated that he had been granted temporary resident status under IRCA § 245A until August 23, 1990. Bravo submitted a copy of an employment authorization card issued to him by the Immigration and Naturalization Service ("INS") on July 21, 1988. The card indicated that he had applied for temporary resident status under IRCA and that he was granted authorization to be employed in the United States until January 20, 1989.

Section 10(c) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(c), authorizes the Board to remedy the effects of unfair labor practices by ordering violators "to take such affirmative action, including ... backpay, as will effectuate the policies of th[e] Act...." The backpay remedy under the Act is designed to restore "the situation, as nearly as possible, to that which would have obtained, but for the illegal discrimination." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).

█ In a backpay proceeding, the General Counsel has the burden to show the gross amounts of backpay due. When it has done so, the Company has the burden to produce evidence to mitigate its backpay liability. *NLRB v. P*I*E Nationwide, Inc.*, 923 F.2d 506, 513 (7th Cir.1991); *NLRB v. Brown & Root*, 311 F.2d 447, 454 (8th Cir.1963).

█ Initially, we note that our review of the Board's factual findings and legal conclusions is limited. We must uphold the Board's factual findings if they are supported by substantial evidence on the record as a whole. *Kankakee–Iroquois County Employers' Ass'n v. NLRB*, 825 F.2d 1091, 1093 (7th Cir.1987); *Lapham–Hickey Steel Corp. v. NLRB*, 904 F.2d 1180, 1184 (7th Cir.1990); *see also Universal Camera v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Board's legal conclusions also warrant deference. On review, we " 'must uphold the legal conclusions of the Board unless they are irrational or inconsistent with the National Labor Relations Act.' " *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1471 (7th Cir.1992) (quoting *Aqua–Chem, Inc. Cleaver–Brooks Div. v. NLRB*, 910 F.2d 1487, 1490 (7th Cir.1990)). We must uphold a remedial order of the Board " 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [NLRA].' " *Id.* (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964)).

█ As it did before the Board, the Company argues that the employees are not entitled to any backpay as a matter of law because they are undocumented aliens. The Company claims that the Board's decision disregards the Supreme Court's holding concerning the backpay remedy in *Sure–Tan*, while the Board counters that its decision is entirely consistent with *Sure–Tan*. Because the decision in *Sure–Tan* is dispositive, we will examine it at some length.

In *Sure–Tan*, after a Board election for Union certification, the companies involved (petitioners in the Supreme Court) informed the INS that several of their employees were undocumented aliens. 467 U.S. at 887, 104 S.Ct. at 2806. After an investigation by the INS, five of the employees agreed to voluntarily depart the United States. *Id.* The Board concluded that the companies had engaged in an unfair labor practice by informing the INS of the employees' undocumented status " 'solely because the employees supported the Union.' " *Id.* at 888, 104 S.Ct. at 2807 (quoting *Sure–Tan, Inc.*, 234 N.L.R.B. 1187 (1978)). As a remedy, the Board found that the deported employees should be entitled to receive reinstatement with backpay, *id.* at 889, 104 S.Ct. at 2807, but it left until compliance proceedings the determination of whether the employees had in fact been available for work. *Id.*

This court modified the Board's order, and concluded that the Board should consider awarding the employees six months backpay. *NLRB v. Sure–Tan*, 672 F.2d 592, 606 (7th Cir.1982). In so ruling, we reasoned that awarding six months backpay would better effectuate the policies of the Act, by deterring the employer from future violations. *Id.* The Supreme Court reversed.

The Supreme Court first held that undocumented aliens are "employees" within the meaning of the NLRA. *Sure–Tan*, 467 U.S. at 891–94, 104 S.Ct. at 2808–09. Turning to the remedial order, the Court stated that it generally approved the Board's course of action in ordering "the conventional remedy of reinstatement with back-

pay, leaving until the compliance proceedings more specific calculations as to the amounts of backpay, *if any*, due these employees." *Id.* at 902, 104 S.Ct. at 2814 (emphasis added). The Court agreed with our holding that "the implementation of the Board's traditional remedies at the compliance proceedings must be conditioned upon the employees' legal readmittance to the United States." *Id.* at 902–03, 104 S.Ct. at 2814. The Court further explained that: "in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual or backpay therefore tolled) *during any period when they were not lawfully entitled to be present and employed in the United States.*" *Id.* at 903, 104 S.Ct. at 2814 (emphasis added).[3] Finally, the Supreme Court stated: "[w]e share the Court of Appeals' uncertainty concerning whether any of the discharged employees will be able either to enter the country lawfully to accept the reinstatement offers *or to establish at the compliance proceedings that they were lawfully available for employment during the backpay period.*" *Id.* at 904, 104 S.Ct. at 2815 (emphasis added).

In requiring employees to show that they were "lawfully available for employment during the backpay period," the Supreme Court reasoned that the Board could not simply disregard the "equally important" Congressional policies underlying the INA. *Id.* at 903, 104 S.Ct. at 2814. The Court seemed to determine that the policy behind the INA—"the objective of deterring unauthorized immigration"—required the employees to show that they were *lawfully* available for employment during the backpay period. Otherwise, undocumented aliens would be rewarded by the NLRB for entering the United States illegally. As Judge Beezer of the Ninth Circuit has argued:

> The unstated premise behind [*Sure–Tan*'s] holding appears to be that an undocumented alien has not been legally harmed by a lay-off or termination. An alien who had no right to be present in this country at all, and consequently had no right to employment, has not been harmed in a legal sense by the deprivation of employment to which he had no entitlement. It may promote the purpose of the NLRA to guarantee the collective bargaining rights of the NLRA to every employee, regardless of immigrant status. But the award provisions of the NLRA are remedial, not punitive, in nature, and thus should be awarded only to those individuals who have suffered harm.

*Local 512*, 795 F.2d at 725 (Beezer, J., dissenting in part). We agree with Judge Beezer, and find that Bravo and Paredez have not been harmed in a legal sense and therefore are not entitled to backpay.

The Company asserts that under the language of *Sure–Tan*, Bravo and Paredez may not receive backpay as a matter of law. Initially, we are inclined to agree with the Company that the plain language of the Supreme Court's opinion bars undocumented aliens from receiving backpay. The Board follows the ALJ in arguing for a narrower interpretation of *Sure–Tan:* that *Sure–Tan*'s holding applies only to undocumented aliens who are no longer within the United States. According to the Board, only if an undocumented alien is outside of the country is he "unavailable" and not eligible to receive backpay.[4]

The Board bases its narrow view of *Sure–Tan*'s holding, in part, on its reading of footnote 11 of the opinion. 467 U.S. at 901 n. 11, 104 S.Ct. at 2814 n. 11. That footnote states in part that: "[i]n the instant case, the Court of Appeals 'estimated' an appropriate period of backpay without any evidence whatsoever as to the period of time these employees might have continued working before apprehension by the

---

**3.** This language is very similar to a statement in our *Sure–Tan* opinion that: "in computing backpay discriminatees will be deemed unavailable for work during any period when not lawfully entitled to be present and employed in the United States...." 672 F.2d at 606.

**4.** In *Local 512*, the Board argued that *Sure–Tan* barred awarding backpay to undocumented alien employees. 795 F.2d at 716. Since *Local 512* was decided, the Board has evidently changed its position.

INS and without affording [the companies] with any opportunity to provide mitigating evidence." The Board insists that footnote 11 indicates that the court intended to limit its holding to the specific factual setting presented—where the undocumented alien employees were no longer within the United States.

We disagree with the Board's interpretation of footnote 11. That footnote is more properly viewed as an additional criticism of our decision to recommend that the Board award six months backpay to the employees. In any event, the text of the opinion is quite clear—undocumented aliens may not receive backpay unless they can show that they were *"lawfully entitled to be present and employed in the United States." Sure–Tan,* 467 U.S. at 903, 104 S.Ct. at 2814.

Moreover, the dissenting opinion of Justice Brennan supports our interpretation of the majority opinion. *Sure–Tan,* 467 U.S. at 906, 104 S.Ct. at 2816 (Brennan, J., concurring in part and dissenting in part). Justice Brennan interpreted the majority's holding to limit the availability of backpay to all undocumented aliens. He wrote: "[o]nce employers, such as petitioners, realize that they may violate the NLRA with respect to their *undocumented alien employees without fear of having to recompense those workers for lost backpay,* their incentive to hire such illegal aliens will not decline, it will increase." *Id.* at 912, 104 S.Ct. at 2819 (emphasis added).

The *Sure–Tan* majority responded to Justice Brennan's dissent at footnote 13, but it is striking that the majority did not criticize Justice Brennan's broad view of its holding. Instead, the majority insisted that the dissent ignored the deterrence value of the cease and desist order, which was unaffected by the majority's holding. *Id.* at 905, 104 S.Ct. at 2815.

The Supreme Court did not limit *Sure–Tan* in *I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). In *Lopez–Mendoza,* the Court stated that *Sure–Tan's* remedial holding permits retrospective sanctions against an employer even where the employee is an illegal alien. *Id.* at 1047 n. 4, 104 S.Ct. at 3488 n. 4. However, an illegal alien "is plainly not entitled to prospective relief—reinstatement and continued employment—that probably would be granted to other victims of similar unfair labor practices." *Id.,* 104 S.Ct. at 3488 n. 4. *Lopez–Mendoza* did not mention backpay; but it should not be read to permit the NLRB to award backpay in view of the language of *Sure–Tan. Id.;* see *Sure–Tan,* 467 U.S. at 903, 104 S.Ct. at 2814. Thus, footnote 4 of *Lopez–Mendoza* undercuts the Union's argument that *Sure–Tan* held only that backpay is tolled where an employee is physically unavailable for work.

The Board argues strenuously that in interpreting *Sure–Tan,* we should follow the Ninth Circuit's decision in *Local 512,* to permit backpay awards to undocumented aliens who remain in the country. The *Local 512* majority reasoned that *Sure–Tan's* holding applies only to undocumented aliens who have departed from the United States. It concluded that because the undocumented alien employees of the company had remained in the country, their wage loss could be "easily and accurately calculated." 795 F.2d at 717.[5] The majority also reasoned that a contrary result would encourage employers to continue to violate the NLRA. It stated: "[i]f employers know that they will incur no backpay liability, they will have less incentive to obey the NLRA." *Id.* at 719. This is same argument made by Justice Brennan in his *dissenting* opinion, which took issue with the *Sure–Tan* majority's remedial holding. 467 U.S. at 912, 104 S.Ct. at 2819.

---

**5.** *See also Bevles Co., Inc. v. Teamsters Local 986,* 791 F.2d 1391, 1394 (9th Cir.1986), *cert. denied,* 484 U.S. 985, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987) (affirming an arbitrator's award of reinstatement and backpay to undocumented alien employees); *but see Bevles Co.,* 791 F.2d at 1391 (Sneed, J., dissenting); *NLRB v. Askenazy*

*Property Management Corp.,* 817 F.2d 74, 75 (9th Cir.1987) (following *Local 512* ); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1516–17 (9th Cir. 1989) (following *Local 512,* to hold that under Title VII illegal aliens are entitled to receive backpay).

The *Local 512* court also insisted that its holding was consistent with two major goals of the INA, which were identified in *Sure-Tan*. The majority reasoned that allowing undocumented aliens to receive backpay would help prevent the loss of American workers' jobs and would help protect American workers' wage rates and working conditions because it would make hiring undocumented aliens less attractive to employers. 795 F.2d at 720. The majority insisted that employers would have less incentive to hire undocumented aliens if they knew that the Board would require them to pay backpay. *Id.* Again, we note that this argument, contained in Justice Brennan's dissenting opinion, *see* 467 U.S. at 912, 104 S.Ct. at 2819, was rejected by the *Sure-Tan* majority. *See* 467 U.S. at 904 n. 13, 104 S.Ct. at 2815 n. 13. *See also Local 512*, 795 F.2d at 724–25 (Beezer, J., dissenting in part). We find unpersuasive the attempt to recast the plain language of the *Sure-Tan* decision.

The Board's final argument is that the legislative history of IRCA supports its interpretation of the *Sure-Tan* decision.[6] The ALJ concluded that, in enacting IRCA, Congress intended to give the Board broad discretion in deciding whether to award reinstatement and backpay to undocumented aliens. In reaching that conclusion, the ALJ quoted from the House Judiciary Committee Report adopting the bill that eventually became enacted as IRCA. The Committee Report states:

> It is not the intention of the Committee that the employer sanctions provisions of the bill be used to undermine or *diminish in any way labor protections in existing law,* or to limit the powers of federal or state labor relations boards, labor standards agencies, or labor arbitrators to remedy unfair practices committed against undocumented employees for exercising their rights *before such agencies or for engaging in activities protected by existing law.* In particular, the employer sanctions provisions are not

intended to limit in any way the scope of the term 'employee' in Section 2(3) of the [NLRA], as amended, or of the rights and protections stated in Sections 7 and 8 of that Act. As the Supreme Court observed in [*Sure-Tan*], application of the NLRA 'helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment.' 467 U.S. at 893 [, 104 S.Ct. at 2809].

H.R. REP. No. 1,000, 99th Cong.2d Sess. 58 (1986) (emphasis added); *see also* H.Rep. No. 99–682 (III), 99th Cong.2d Sess., at 8–9 (Report of House Education and Labor Committee).

We agree with the Company that the Committee Report merely endorses the first holding of *Sure-Tan*, that undocumented aliens are employees within the meaning of the NLRA. The Committee did not disapprove of the part of the decision holding that undocumented aliens are entitled to receive backpay only for those periods when they are lawfully entitled to be present and employed in the United States. The Committee's preference that existing law be preserved can be read as support for the remedial holding of *Sure-Tan*. We do not believe that Congress, in passing IRCA, expressed its dissatisfaction with *Sure-Tan*'s remedial holding. Indeed, in *INS v. National Center For Immigrants' Rights*, —— U.S. ——, —— n. 8, 112 S.Ct. 551, 558 n. 8, 116 L.Ed.2d 546 (1991), the court noted that IRCA reinforced the policy of the INA to preserve employment for American workers.

■ Therefore, we hold that under the immigration laws Bravo and Paredez may not receive backpay for "any period when they were not lawfully entitled to be present and employed in the United States." *Sure-Tan*, 467 U.S. at 903, 104 S.Ct. at 2814; *Local 512*, 795 F.2d at 724 (Beezer, J., dissenting in part); *accord Ibarra v.*

---

**6.** It is quite clear that IRCA itself does not control the rights of Bravo and Paredez to receive backpay. Section 274A of IRCA, 8 U.S.C. § 1324a(a), which makes it illegal to employ

undocumented aliens, does not affect Bravo and Paredez because it took effect on November 6, 1986, long after they were terminated, and after this court enforced the Board's order.

*Texas Employment Com'n,* 645 F.Supp. 1060, 1071 (holding that *Sure–Tan*'s holding did not apply to workers who were lawfully entitled to be present and employed in the United States), *rev'd on other grounds,* 823 F.2d 873 (5th Cir.1987).[7] Our holding, of course, applies only to discharges of undocumented aliens occurring before the enactment of IRCA. Section 274A of IRCA, 8 U.S.C. § 1324a(a), makes it unlawful for an employer to hire an undocumented alien; and thus, clearly bars the Board from awarding backpay to undocumented aliens wrongfully discharged after IRCA's enactment. *See EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1517–18 n. 11 (9th Cir.1989) (indicating that the enactment of IRCA might "change[ ] the mix of policy considerations underlying the case law which supports our conclusion that undocumented employees may recover back pay in a Title VII action.").

█ We consider next the ALJ's ruling requiring the Company to produce a final deportation order from the INS to prove that Bravo and Paredez were undocumented aliens. As we noted above, at the time of the hearing, the INS had not issued a final deportation order; thus, the Company was unable to meet the standard established by the ALJ.

The Board argues that the ALJ correctly placed this burden on the Company. The ALJ's opinion, which was adopted by the Board, quotes with approval the Ninth Circuit's statement that "[t]he federal immigration laws are exceedingly complex.... It is hard to believe that Congress wished to place upon an NLRB compliance officer ... the responsibility of determining the alien status of an undocumented worker...." *Local 512,* 795 F.2d at 721.

*Sure–Tan* held that "[i]n devising remedies for unfair labor practices, the Board is

obliged to take into account another 'equally important Congressional objectiv[e]' ... the objective of deterring unauthorized immigration that is embodied in the INA." 467 U.S. at 903, 104 S.Ct. at 2814 (quoting *Southern S.S. Co. v. NLRB,* 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246 (1942)) (citation omitted). The Company insists that Bravo and Paredez should have the burden to produce documents demonstrating that they were lawfully entitled to work in the United States. *Sure–Tan* itself contemplates that the employee would be required to establish legal entitlement to work. The Court stated:

> We share the Court of Appeals' uncertainty concerning whether any of the discharged employees *will be able* either to enter the country lawfully to accept the reinstatement offers or *to establish* at the compliance proceedings *that they were lawfully available for employment during the backpay period.*

467 U.S. at 904, 104 S.Ct. at 2815.

The standard used by the ALJ is not consistent with the Supreme Court's opinion because the ALJ placed the burden on the Company to prove undocumented status. Moreover, if applied to the facts of *Sure–Tan,* the ALJ's standard would change the result. In *Sure–Tan,* after their employers reported them to the INS, the undocumented alien employees agreed to voluntary departure from the United States. *See* 467 U.S. at 887, 104 S.Ct. at 2806. Under the ALJ's standard, because the employees were not deported pursuant to a final deportation order, they would be entitled to receive backpay. It is readily apparent that such a result is not consistent with *Sure–Tan.* Moreover, adoption of the standard used by the ALJ would encourage employers, once Board proceed-

---

7. We also find *Patel v. Quality Inn South,* 846 F.2d 700, 706 (11th Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 182 (1989), holding that undocumented aliens were entitled to maintain an action for unpaid wages and damages under the Fair Labor Standards Act ("FLSA") for work they had already performed, to be distinguishable. We note that Bravo and Paredez do not seek recovery for work already performed, but for work which

they would have performed if they had remained with the Company. *Rios v. Enterprise Ass'n Steamfitters Local 638,* 860 F.2d 1168, 1173 (2d Cir.1988), holding that undocumented aliens were eligible to receive backpay under Title VII, is also distinguishable. Because an undocumented alien's right to backpay under the FLSA and Title VII is not at issue here, we do not reach those issues.

ings began, to seek final deportation orders to avoid paying undocumented alien employees backpay.

We do not find it problematic to require employees seeking a backpay award to come forward with documents establishing their lawful entitlement to be present in the United States. Despite the claims made by the *Local 512* majority, we cannot find that this standard is overly burdensome to the employees or to the Board, which would be required to initially evaluate an employee's documentation. Requiring the Board to examine an employee's documentation is the same duty that IRCA now imposes on virtually every employer in the United States when it hires an employee. *See* 8 U.S.C. § 1324a(a) (making employment of unauthorized aliens unlawful), (b) (requiring employers to verify an employee's documentation). Section 1324a(b)(1)(A) requires only that the employer, or a person examining the documentation, verify that the employee is not an unauthorized alien. The examining person has complied with the law "if the [documentation of lawful immigrant status] reasonably appears on its face to be genuine." *See also* 8 U.S.C. § 1182(a)(5) (an undocumented alien who seeks to enter the United States to perform skilled or unskilled labor is excludable unless the Secretary of Labor finds that an exception applies).

We do not find that the requirements of this statute are unduly burdensome. Moreover, the Social Security Administration has followed a similar practice by withholding benefits from aliens who cannot present documentation of their immigrant status. *See* 20 C.F.R. § 422.107 (1991) (an applicant for a social security number must submit documentation establishing United States citizenship or alien status). The Social Security Administration, which evaluates the documentation, evidently does not find these requirements to be unduly burdensome. We conclude that requiring an employee to present evidence that he is lawfully present and eligible for employment is the only rule that would be consistent with the policies behind the immigration laws. Because the Board stipulated that Bravo and Paredez were undocu-

mented aliens during their employment with the Company, they were not lawfully entitled to be present and employed in the United States during most of the backpay period. Therefore, backpay was tolled during those periods. They may establish an entitlement to backpay for any period after they were lawfully entitled to be present and employed in the United States. On remand, they will have the opportunity to establish when they became entitled to receive backpay.

Therefore, we DENY the Board's petition for enforcement of its order and we GRANT the Company's petition for review of that order.

CUDAHY, Circuit Judge, dissenting.

The majority decides this case by applying the "plain language" of *Sure-Tan.* But the language the majority applies was, of course, not directed to the present problem. I feel confident of this, since I was the first to use the language. *Ante* at 266 n. 3 (citing *NLRB v. Sure-Tan, Inc.*, 672 F.2d 592, 606 (7th Cir.1982) (Cudahy, J.)). Given that *Sure-Tan* clearly does not decide this case, we may not reject the carefully reasoned decision of the NLRB. In addition, I believe that the majority's holding undermines our national immigration policy. Accordingly, I respectfully dissent.

When the Court used the phrases "lawfully entitled to be present and employed in the United States" and "lawfully available for employment," the majority reasons, it meant that an alien who wants backpay must have a green card. *Sure-Tan*, 467 U.S. at 903 & 904, 104 S.Ct. at 2814-15. But that question was not even before the Court. Indeed, it was not before this court either when I first wrote that "discriminatees will be deemed unavailable for work during any period when not lawfully entitled to be present and employed in the United States." *NLRB v. Sure-Tan*, 672 F.2d at 606. Instead, both the Court and the panel for which I wrote faced a significantly different scenario. In *Sure-Tan*, the aliens in question were not only undocumented, they were not in the country. They could not reenter for the purpose of

taking up employment without breaking the law. *This* was the Court's concern in *Sure–Tan* (and the panel's concern before it): the NLRB must not undermine the INA by awarding backpay in a way that would encourage aliens to break the law. 467 U.S. at 903, 104 S.Ct. at 2814 ("the Board is obliged to take into account ... the objective of deterring unauthorized immigration"); *see also Local 512, Warehouse and Office Workers' Union v. NLRB*, 795 F.2d 705, 717 (9th Cir.1986); and *Rios v. Enterprise Ass'n Steamfitters Local 638*, 860 F.2d 1168, 1172–73 (2d Cir. 1988) (restriction on backpay to illegal aliens in *Sure–Tan* is addressed only to aliens who have left the country).

Once an alien has crossed the border, however, employment is not an additional offense (in fact, it is no crime at all). *Sure–Tan*, 467 U.S. at 893, 104 S.Ct. at 2809. Unlike the employees in *Sure–Tan*, Bravo and Paredez did not have to commit crimes in order to be *physically* available for work. This distinction between having to break the law to reach the workplace and lacking a formal legal entitlement to work is the only reading of *Sure–Tan* that makes sense of its footnote 11. There the Court accepts the view that the aliens in *Sure–Tan* would be entitled to backpay for the "period of time these employees might have continued working before apprehension by the INS...." 467 U.S. at 901 n. 11, 104 S.Ct. at 2814 n. 11. The footnote was indeed an "additional criticism" of my opinion for the panel, *ante* at 267, but its implications clearly support my interpretation of the Court's opinion for present purposes.

The NLRB does not require discriminatees to show that they were legally entitled to work before awarding backpay. As the Ninth Circuit noted in *Local 512*, the NLRB has awarded backpay to truck drivers without licenses and to children too young to work. 795 F.2d at 717–18 (citing, *inter alia, Justrite Mfg. Co.*, 238 NLRB 57, 65–67 (1978) (underage discriminatee); *New Foodland, Inc.*, 205 NLRB 418, 420–21 (1973) (same); *Robinson Freight Lines*, 129 NLRB 1040, 1042 (1960) (unlicensed truck driver); and *Local 57, Int'l Union of Operating Engineers*, 108 NLRB 1225, 1227–28 (1954) (unlicensed engineer)). This is still the Board's policy. *De Jana Inds., Inc.*, 305 NLRB No. 122 at 3 (1991) (awarding backpay to unlicensed ambulance driver; length of backpay period depends on driver's reasonably diligent efforts to seek license or obtain other employment); *see also NLRB v. Future Ambulette, Inc.*, 903 F.2d 140, 145 (2d Cir.1990) (award of backpay to unlicensed driver limited to period when company employed other unlicensed drivers). These awards are remedial in the strictest sense of the term: they give the discriminatee the earnings she would have earned if not for the unfair labor practice. We cannot deny backpay to Bravo and Paredez without calling all of these awards into question.

The distinction I draw is reinforced by the Supreme Court's comment on *Sure–Tan* in *INS v. Mendoza–Lopez*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). There the Court noted that the NLRB has the authority to award "retrospective sanctions" against employers who commit unfair labor practices against illegal aliens but may not award "prospective relief—reinstatement and continued employment." *Id.* at 1047–48 n. 4, 104 S.Ct. at 2808. The majority cites this reference to *Sure–Tan*, *ante* at 1120–21, and appears to believe that it undercuts the NLRB's argument because it does not mention the word "backpay." But backpay is a standard retrospective sanction. Further, I am not arguing for the propriety of an order of reinstatement for an illegal alien. And more importantly, the NLRB would not issue such an order. In the same cases I have already cited, the NLRB has made plain that it will not order reinstatement for discriminatees who are not entitled to work. *See, e.g., De Jana*, 305 NLRB No. 122 at 3 ("Respondent has no obligation to reinstate Barton as a driver until he demonstrates that he has an appropriate driver's license.").

I do not believe we have the authority to deny enforcement on the grounds that the NLRB may not make backpay awards to those who are not legally entitled to work.

The Supreme Court has repeatedly advised us that the NLRB has "primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Sure–Tan,* 467 U.S. at 898–99, 104 S.Ct. at 2812 (citations omitted). The NLRB's legal conclusions are to be upheld so long as they are "not irrational or inconsistent with the [Act]." *NLRB v. Financial Institution Employees,* 475 U.S. 192, 202, 106 S.Ct. 1007, 1012, 89 L.Ed.2d 151 (1986). To be sure, the Court appears to have set a new limit on the NLRB's remedial powers in *Sure–Tan:* a backpay remedy "must be sufficiently tailored to expunge only the *actual,* and not merely *speculative,* consequences of unfair labor practices," *Sure–Tan,* 467 U.S. at 900, 104 S.Ct. at 2813 (citation omitted, emphasis in original). But there is no dispute here that Bravo and Paredez lost real wages from their real jobs when Del Rey fired them.

Frankly, I do not see what policy *is* served by the majority's holding. Certainly the purposes of the NLRA are not served by allowing employers to get off lightly just because they commit an unfair labor practice against an employee who happens to be an illegal alien. The majority's holding also undermines the remedial purposes of the Act by denying discriminatees the pay that they would have received if not for the unfair labor practice. *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). Finally, I think the majority's holding is bad immigration policy.

Illegal aliens do not come to this country in order to gain the protection of our labor laws. They come here for jobs. They can find jobs because they are often willing to work hard in rotten conditions for little money. Their willingness to work for less means that American workers too must settle for less, or risk settling for unemployment. When we deny backpay to illegal aliens, we tell employers to hire more of them; for aliens who cannot claim monetary damages for unfair labor practices are less expensive to hire and less trouble than their native counterparts. *Sure–Tan,* 467 U.S. at 912, 104 S.Ct. at 2819 (Brennan, J.,

dissenting); *see also Patel v. Quality Inn South,* 846 F.2d 700, 704–05 (11th Cir.1988) (concluding that Fair Labor Standards Act applies to undocumented aliens and permits recovery of unpaid minimum wages), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 182 (1989).

It is true that this policy analysis did not carry the day when applied to the backpay remedy at issue in *Sure–Tan.* But Justice O'Connor's opinion can hardly be said to have rejected the point: "Application of the NLRA helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment." *Id.* 467 U.S. at 893, 104 S.Ct. at 2809 (plurality opinion). More importantly, however, Congress has vindicated Justice Brennan's views. The majority has quoted the committee report that accompanied the Immigration Reform and Control Act of 1986 (IRCA). *Ante* at 1121–22 (quoting H.R.Rep. No. 1,000, 99th Cong., 2d Sess. 58 (1986)). That report, in turn, quotes the same language from the plurality opinion in *Sure–Tan* that I have just noted. *Id.* The only argument the majority can make is that IRCA does not change the result in *Sure–Tan. Ante* at 1122. I agree that IRCA does not alter *Sure–Tan,* but the question before us is not whether *Sure–Tan* is good law. Rather, the question is whether *Sure–Tan* decides this case. The point is that Congress has recognized the importance of retaining labor law protections for illegal aliens, *as a means of protecting the rights of persons legally entitled to work.* The majority's interpretation of *Sure–Tan* undermines the purposes of our immigration laws—exactly the result that the plurality in *Sure–Tan* would not permit. 467 U.S. at 883, 104 S.Ct. at 2804.

The language the Court used in *Sure–Tan* was not intended to cover this case. And if we read *Sure–Tan* to control this case, we must implicitly reject a long line of NLRB precedent that authorizes backpay awards to employees who are not legally entitled to their jobs. I believe we should defer to the NLRB's reading of

*Sure–Tan,* which furthers the purposes of the NLRA and the immigration laws. Accordingly, I respectfully dissent.